Argued and submitted September 10, 2004, decisions of Court of Appeals and orders of Driver and Motor Vehicle Services Branch and Department of Transportation reversed; case numbers S50003, S50007, and S50044 remanded to Driver and Motor Vehicle Services Branch for further proceedings, and case numbers S49978 and S50458 remanded to Department of Transportation for further proceedings March 23, reconsideration denied June 20, 2006

OUTDOOR MEDIA DIMENSIONS, INC.,
*Petitioner on Review,*

*v.*

DEPARTMENT OF TRANSPORTATION,
*Respondent on Review.*

ODOT 88691, 89838, 90587, 90588, 90589, 91564;
CA A116814; SC S50458

OUTDOOR MEDIA DIMENSIONS, INC.,
*Petitioner on Review,*

*v.*

DEPARTMENT OF TRANSPORTATION,
*Respondent on Review.*

ODOT 79817, 85185;
CA A113875 (Control), A114027; SC S49978

OUTDOOR MEDIA DIMENSIONS, INC.,
*Petitioner on Review,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES BRANCH (DMV),
*Respondent on Review.*

DMV 66981, 68677, 70642, 74573, 74889;
CA A106450; SC S50007

OUTDOOR MEDIA DIMENSIONS, INC.,
*Petitioner on Review,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES BRANCH (DMV),
*Respondent on Review.*

DMV 58118; CA A102328; SC S50003

OUTDOOR MEDIA DIMENSIONS, INC.,
*Petitioner on Review,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES BRANCH (DMV),
*Respondent on Review.*

DMV 61907, 63047;
CA A100658 (Control), A100659; SC S50044
(Consolidated for Argument and Opinion)

132 P3d 5

See also 331 Or 634, 20 P3d 180.

Alan R. Herson, Jacksonville, argued the cause and filed the briefs for petitioner on review.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. With her on the briefs were Kelly Knivila, Assistant Attorney General, Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Russell L. Baldwin, Lincoln City, argued the cause and filed the brief for *amicus curiae* Ray Drayton.

Michael T. Garone, of Schwabe, Williamson & Wyatt, P.C., Portland, filed the brief for *amicus curiae* Oregon Outdoor Advertising Association. With him on the brief were Donald Joe Willis and Jill S. Gelineau.

Margarita Molina, of Davis Wright Tremaine, Portland, filed the brief for *amicus curiae* ACLU Foundation of Oregon. With her on the brief was Patricia McGuire.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs, De Muniz,*** and Balmer, Justices.****

BALMER, J.

** Chief Justice when case was argued.

*** Chief Justice when decision was rendered.

**** Kistler, J., did not participate in the consideration or decision of this case.

Riggs, J., concurred in part and dissented in part and filed an opinion.

## BALMER, J.

Article I, section 8, of the Oregon Constitution provides, in part, that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]" In these five consolidated cases, we consider the relationship between that provision and the state's regulation of signs along highways under the Oregon Motorist Information Act, ORS 377.700 to 377.840 and ORS 377.992 (1999) (OMIA).[1] For the reasons that we discuss below, we conclude that (1) many of the OMIA's restrictions on highway signs, including the imposition of certain permit and fee requirements, are reasonable time, place, and manner restrictions that are unrelated to the substance of any particular message and therefore do not violate Article I, section 8; but (2) the OMIA unconstitutionally restricts the "subject" of expression in violation of Article I, section 8, by requiring a permit for a sign whose message does not relate to the premises on which the sign is located while providing an exemption for a sign whose message does relate to the premises on which the sign is located.

## I.  BACKGROUND

Petitioner, Outdoor Media Dimensions, Inc., is an outdoor advertising company that owns signs visible from state highways. In each of these cases, the state cited petitioner for displaying one or more of its outdoor advertising signs without a permit in violation of the OMIA and ordered the removal of the signs.[2] The state issued one of those citations under the 1999 version of the OMIA and the other citations under earlier versions.[3] Petitioner challenged each citation on several state and federal constitutional grounds, and,

---

[1] Unless otherwise indicated, we refer in this opinion to the 1999 version of the OMIA.

[2] The Driver and Motor Vehicle Services Branch issued three of the citations, and the Department of Transportation issued the two other citations. For convenience, we refer to those state agencies collectively as the "state" or the "agency."

[3] The legislature has amended the OMIA many times. In 1999, the legislature made a number of changes to the OMIA, including adding a definition of "on-premises sign" and changing the exemptions to the OMIA's permit requirement. *See* Or Laws 1999, ch 877, §§ 2, 7. The state does not rely on or seek to enforce

in each case, the agency upheld the citation and ordered petitioner to remove the signs. On judicial review, the Court of Appeals affirmed each agency decision. *Outdoor Media Dimensions v. Dept. of Transportation*, 187 Or App 503, 68 P3d 274 (2003); *Outdoor Media Dimensions v. ODOT*, 185 Or App 161, 57 P3d 970 (2002); *Outdoor Media Dimensions v. DMV (A10645)*, 184 Or App 502, 56 P3d 935 (2002); *Outdoor Media Dimensions v. DMV (A103238)*, 184 Or App 501, 56 P3d 522 (2002); *Outdoor Media Dimensions v. DMV (A100659)*, 184 Or App 495, 56 P3d 935 (2002). Petitioner petitioned for review of each decision in this court, and we allowed those petitions.

We begin with an overview of the OMIA. As this court explained in an earlier case brought by petitioner, *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 20 P3d 180 (2001) *(Outdoor Media I)*, the legislature enacted the OMIA in 1971 to comply with the federal Highway Beautification Act of 1965 (HBA), 23 USC § 131. The HBA established federal standards for erecting and maintaining advertising signs along interstate and federally aided primary highways. The HBA requires each state to provide "effective control" of outdoor advertising signs. 23 USC § 131(b), (c). If a state fails to do so, then it may lose 10 percent of its federal highway funds. 23 USC § 131(b). "Effective control" essentially requires states to prohibit all outdoor advertising signs that are visible from an interstate or primary highway, unless a particular sign meets one of five statutory exceptions or is located in an industrial or commercial zone. *Outdoor Media I*, 331 Or at 637. Those exceptions include "on-premises" signs that advertise "activities conducted on the property on which they are located," "directional and official signs and notices," and "signs * * * advertising the sale or lease of property upon which they are located." 23 USC § 131(c).

The OMIA comprehensively regulates signs visible from public highways for the purposes of "promot[ing] the public safety," "preserv[ing] the recreational value of public

provisions of the OMIA that no longer are in effect. Because the earlier versions of the OMIA are not relevant to the relief that petitioner seeks—reversal of the agency orders requiring removal of its signs—we do not address petitioner's arguments that relate to provisions of the OMIA that have been changed.

travel on the state's highways," and "preserv[ing] the natural beauty and aesthetic features of such highways." ORS 377.705. It does so by prohibiting some kinds of signs, setting size and other limitations on signs that are not prohibited, and establishing a permit requirement for certain signs. The OMIA, for example, prohibits signs that prevent a driver from having a clear and unobstructed view of approaching or merging traffic, ORS 377.720(2); that include flashing or moving lights, ORS 377.720(3); that are not maintained "in a neat, clean and attractive condition and in good repair," ORS 377.720(8); or that are on a vehicle or trailer, unless the vehicle or trailer is used for transportation by the owner or person in control of the property on which it is located, ORS 377.720(10). The OMIA requires certain minimum spacing between "outdoor advertising signs," ORS 377.750, and provides that those signs may not exceed a length of 48 feet and a height, excluding foundation and supports, of 14 feet. ORS 377.745(1).

Of particular relevance to these cases, the OMIA establishes a permit requirement for outdoor advertising signs,[4] regulates the permissible location of those signs, ORS 377.765(1), and effectively caps the number of permits at the number of outdoor advertising signs located in commercial or industrial zones as of June 12, 1975. *See Outdoor Media I*, 331 Or at 638 (citing ORS 377.712). In contrast, "on-premises" signs specifically are exempted from the permit requirement, ORS 377.735(1)(c),[5] although they are subject to certain other parts of the OMIA described above, such as

---

[4] ORS 377.725(1) provides, "Unless an annual permit has been issued therefor, an outdoor advertising sign or a directional sign shall not be erected, maintained or replaced by any person." *See also* ORS 377.715 ("A person may not erect or maintain an outdoor advertising, on-premises or directional sign visible to the traveling public from a state highway * * * unless it complies with [the OMIA and federal requirements].").

[5] The 1999 amendments to the OMIA eliminated a long list of exemptions from the permit requirement, leaving only the exemptions for government signs, certain temporary signs, and on-premises signs. ORS 377.735(1); Or Laws 1999, ch 877, § 7. As previously noted, because those former exemptions have no place in the present regulatory scheme and have no impact on the enforcement actions against petitioner or the relief that petitioner seeks, we do not consider them. As to the remaining exemptions, petitioner has offered fully developed arguments as to the on-premises exemption only, and we consider those arguments later in this opinion.

the prohibition on flashing lights and the requirement that they be maintained in a neat and clean condition. The permits required for outdoor advertising signs may be transferred as of right by notifying the state, ORS 377.725(2), and the message on any such sign may be changed without a new permit and without state approval. ORS 377.725(8). The permit fee is set at a level to recover the cost to the state of administering the regulatory program. ORS 377.729 (2001).

The OMIA's definitions of "on-premises sign" and "outdoor advertising sign" are central to the Article I, section 8, issues in this case. The legislature defined those terms in ORS 377.710:

"(22) 'On-premises sign' means a sign designed, intended or used to advertise, inform or attract the attention of the public as to:

"(a) Activities conducted on the premises on which the sign is located; or

"(b) The sale or lease of the premises on which the sign is located.

"(23) 'Outdoor advertising sign' means a sign designed, intended or used to advertise, inform or attract the attention of the public as to:

"(a) Goods, products or services which are not sold, manufactured or distributed on or from the premises on which the sign is located;

"(b) Facilities not located on the premises on which the sign is located; or

"(c) Activities not conducted on the premises on which the sign is located."

As a result of the definitions just quoted and the substantive provisions of the OMIA that we outlined previously, a person who wants to erect an on-premises sign need not obtain a permit from the state, while a person who wants to erect an outdoor advertising sign must obtain one of the limited number of available permits.[6]

---

[6] As we discuss in greater detail below, the statutory definitions of "on-premises sign" and "outdoor advertising sign" raise a number of interpretive issues that we do not address in this opinion, including the meaning of the phrase "activities conducted [or not conducted] on the premises on which the sign is located." It

## II. PROCEEDINGS BELOW
## AND PETITIONER'S ARGUMENTS

With that summary of the OMIA's key provisions in mind, we return to petitioner's cases. Before the Court of Appeals, petitioner did not challenge any finding of fact in the agency orders, but it raised a number of constitutional arguments. Petitioner argued, among other things, that the administrative procedure that led to the final agency orders violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution; that the OMIA permit and fee requirements are prior restraints in violation of Article I, section 8, and the First Amendment to the United States Constitution; that the OMIA violates the First Amendment by giving greater protection to commercial than to noncommercial speech; that the OMIA regulates speech, both generally and on the basis of content, in violation of Article I, section 8; that the OMIA violates the Equal Protection Clause of the Fourteenth Amendment; and that the OMIA violates Article I, section 20, of the Oregon Constitution.[7]

The Court of Appeals rejected petitioner's claims in each case, holding that the claims either had been resolved against petitioner's position in earlier cases or did not merit discussion. *See, e.g., Outdoor Media Dimensions*, 184 Or App at 496 (illustrative holding). Judge Landau wrote a concurring opinion in one of those cases. He agreed with the majority that Court of Appeals precedent compelled affirmance of the agency orders, but he questioned whether those precedents—which rejected petitioner's Article I, section 8, challenge to the OMIA's distinction between off-premises signs and on-premises signs—were valid in light of this court's opinion in *Fidanque v. Oregon Govt. Standards and Practices*, 328 Or 1, 969 P2d 376 (1998). *Outdoor Media Dimensions*, 184 Or App at 496-98 (Landau, J., concurring).

---

is sufficient for purposes of this opinion that the OMIA classifies *some* otherwise identical signs as on-premises signs if their message advertises activities conducted on-premises (*e.g.*, "Buy Gas Here"), but as outdoor advertising signs if their message advertises goods not sold on the premises (*e.g.*, "Gas for Sale: 10 Miles Ahead").

[7] Petitioner did not make all of those arguments in each case.

In this court, petitioner reiterates the arguments that it made before the Court of Appeals. Petitioner asserts that various provisions of the OMIA, on their face, violate the federal and state constitutions and that, to the extent that those provisions are not facially unconstitutional, they are unconstitutional as the state has applied them to petitioner in these cases. As the discussion below will make clear, however, petitioner's claims are, by and large, facial challenges to the OMIA's regulatory scheme, and only in a few instances is it useful to discuss the application of the OMIA to petitioner in particular.

In our view, two constitutional issues are at the heart of this case: First, whether the state may regulate highway signs by imposing content-neutral restrictions on those signs, including permit and fee requirements, as it does under the OMIA; and second, whether the OMIA's distinction between outdoor advertising signs, sometimes referred to as "off-premises" signs, and on-premises signs, for purposes of the permit and fee requirements, violates Article I, section 8. We now turn to those issues.

## III. THE OMIA'S RESTRICTIONS ON SIGNS, INCLUDING PERMIT AND FEE REQUIREMENTS

Petitioner first argues that the OMIA's permit and fee requirements violate Article I, section 8, because they are impermissible prior restraints. Petitioner further asserts that those requirements, as well as the OMIA's other restrictions on signs, violate Article I, section 8, because they improperly restrict petitioner's right to erect the kind of sign that it wishes where it wishes.

### A. *Petitioner's Prior Restraint Argument*

■■ Petitioner argues that, because the OMIA requires a person to obtain a permit *before* an outdoor advertising sign lawfully may be erected, it is an unconstitutional prior restraint. Petitioner claims that "Article I, section 8, mandates that speech can be displayed without a permit," and that, under that provision, the state "may take action only after the speech is displayed." The state first responds that petitioner cannot sustain a prior restraint claim because no prior restraint occurred in these cases: Petitioner *did*

"display" his "speech" without a permit, and the state took action only after petitioner did so. The state argues that, as in *Outdoor Media I*, petitioner never applied for or obtained permits for the erection or maintenance of its signs and therefore was not subject to any prior restraint. In that case, this court rejected petitioner's "prior restraint" claim, holding that, "respecting prior restraint, none occurred under the facts of this case." 331 Or at 654 n 11. The state argues that this case is in the same procedural posture and that, as in *Outdoor Media I*, we should decline to consider petitioner's argument that the permit requirement is an unconstitutional prior restraint.

The state is mistaken. The prior restraint issue in *Outdoor Media I* involved petitioner's claim for damages under 42 USC section 1983, and this court concluded that, because petitioner had erected and maintained its signs without permits notwithstanding the OMIA's permit and fee requirements, he could not prove that those requirements had caused his alleged damage. *Id.* at 654-55. Here, in contrast, petitioner does not seek monetary damages but instead argues that the permit and fee requirements that are the basis for the orders requiring removal of its signs are themselves unconstitutional prior restraints. The parties agree that those requirements, on their face, apply to petitioner, so the only question is whether they are constitutionally permissible. In those circumstances, we perceive no reason to require petitioner to seek permits for its signs before raising its constitutional challenges.

We turn to the merits of petitioner's prior restraint argument. As noted, petitioner argues that the requirement that it pay a fee and obtain a permit before erecting an outdoor advertising sign constitutes a prior restraint that is barred by Article I, section 8. The state counters that the permit and fee requirements are not impermissible prior restraints because they are content neutral and have adequate standards to guide official discretion in the issuance of permits. The gravamen of a prohibited prior restraint, according to the state, is the prospect of government censorship of speech; the OMIA's content-neutral permit and fee requirements do not raise that prospect and thus are not unconstitutional prior restraints.

In *City of Portland v. Welch*, 229 Or 308, 367 P2d 403 (1961), this court considered a city ordinance that required persons wishing to exhibit movies to the public to obtain a license from a government censor. It held the ordinance unconstitutional under Article I, section 8, because it was a prior restraint, stating that "[c]ensorship by licensing is, of course, a prior restraint," 229 Or at 320, and "the draftsmen of Oregon's basic charter wanted no censorship in Oregon." *Id.* Similarly, this court more recently held that a provision of the Oregon Uniform Trade Secrets Act was an unconstitutional prior restraint because it allowed a court to order a person "not to disclose an alleged trade secret without prior court approval." *State ex rel Sports Management News v. Nachtigal*, 324 Or 80, 88, 921 P2d 1304 (1996) (quoting ORS 646.469). This court described that statute as authorizing a "classic" prior restraint, because it permitted a judge to require a third-party publisher who had not committed a crime in obtaining its information "to submit its speech for court approval before publication." *Id.*

*Welch* and *Sports Management News* illustrate the purpose of the prohibition on prior restraints: to bar the state from deciding in advance what expression it will permit. *See Welch*, 229 Or at 319-20 (describing reasons for ban on prior restraint). The OMIA's permit and fee scheme, with the exception of the statutory off-premises/on-premises distinction that we discuss below, does not allow the state to ban certain expression in advance. The owner of a sign that existed on June 12, 1975, and that was located in a commercial or industrial zone on that date, "is entitled to the issuance" of a permit, ORS 377.712(1), and the messages on permitted signs may be changed without state approval. ORS 377.725(8). The license requirement in *Welch* and the judicial prior approval of speech at issue in *Sports Management News* gave the government the authority to decide, in advance, what movie scenes or magazine content would be permitted. From all that appears in this record, the OMIA's permit and fee requirements are focused on covering the cost of a content-neutral permit scheme and are implemented in a content-neutral and nonarbitrary manner. For that reason, the permit and fee requirements pose no danger of official censorship and, therefore, do not constitute impermissible prior restraints on expression in violation of Article I, section 8.

## B. *Petitioner's "No Regulation" Argument*

■ Petitioner raises several objections to the OMIA in addition to the prior restraint argument, which we have rejected above, and the permit exemption for on-premises signs, which we discuss below. Those include its arguments that the fee requirement violates Article I, section 8, because it "necessarily deters Oregonians from expressing themselves freely on any subject" and that any "regulation of the placement of speech on otherwise lawful structures violates Article I, section 8 * * *." Moreover, implicit in petitioner's state constitutional arguments is the assumption that Article I, section 8, prohibits *any* time, place, and manner regulations—such as the OMIA's location, size, permit, and fee provisions. Petitioner also asserts that those regulations are to be examined using the test for restrictions on the *content* of speech that this court articulated in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and recently reaffirmed in *State v. Ciancanelli*, 339 Or 282, 121 P3d 613 (2005).

■ ■ *Amicus* Oregon Outdoor Advertising Association (OOAA) takes a similar position, arguing that, under Article I, section 8, "a law that does not favor or disfavor a particular viewpoint is nonetheless content based if it burdens, in any manner, protected speech." OOAA appears to view Article I, section 8, as barring any "burden" on "protected speech," regardless of the extent of the burden or its content neutrality or viewpoint neutrality.[8]

---

[8] In general, the term "content neutral" means that a particular restriction on expression applies to all expression, regardless of its subject or content. For example, a law or other government action that prohibits all signs that interfere with drivers' lines of sight near an intersection is "content neutral," while a law that permits noncommercial (for example, political) signs but prohibits commercial signs is not content neutral. *See generally* Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 U Chi L Rev 46 (1987) (analyzing First Amendment cases involving content-neutral restrictions on speech). The term "viewpoint neutral" means that the government action, although restricting some expression and permitting other expression, is neutral as to the particular views that it allows to be expressed. Under the First Amendment, for example, a state-run television network is permitted to decide which candidates may participate in a televised debate and to exclude minor candidates, as long as the exclusion is not based on the viewpoints of the excluded candidates. *See, e.g., Arkansas Educ. Television Comm'n v. Forbes*, 523 US 666, 118 S Ct 1633, 140 L Ed 2d 875 (1998) (exclusion of independent candidate with little public support from debate televised by state network was "viewpoint neutral" and did not violate First Amendment). This court has not had occasion to determine the extent to which Article I, section 8, might require "viewpoint neutrality."

■ The state responds that, while most of this court's Article I, section 8, decisions over the last two decades have focused on laws that restrict certain speech because of its content, and thus have relied on the framework for analyzing content-based restrictions set out in *Robertson*, this court never has held that Article I, section 8, bars all regulation of speech, including content-neutral regulations imposed for reasons of public safety, aesthetics, or other important public purposes. The state therefore argues that the OMIA's permit and fee requirements and its geographic and size limits on signs are permissible time, place, and manner restrictions[9] that do not violate Article I, section 8.

The parties correctly view *Robertson* as establishing the framework "that this court traditionally has employed in evaluating Article I, section 8, challenges." *Fidanque*, 328 Or at 5. *Robertson* distinguished "between laws that focus on the *content* of speech or writing and laws that focus on proscribing the pursuit or accomplishment of *forbidden results*," holding that the former violate Article I, section 8, unless the prohibition comes within a well-established historical exception. *State v. Plowman*, 314 Or 157, 163, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993) (summarizing holding of *Robertson*; emphasis in *Plowman*). *Robertson* further divided the latter type of laws, those that focus on forbidden results, into two categories: those laws that prohibit expression used to achieve those prohibited effects and those laws that focus on the forbidden effects without referring to expression at all. *Plowman*, 314 Or at 164 (citing *Robertson*, 293 Or at 417-18). Because content-neutral time, place, and manner restrictions focus on the accomplishment of "forbidden results," but do so by restricting expression, such restrictions appear to come within the second of the three *Robertson* categories. Yet

---

[9] The phrase "time, place, and manner restrictions" originated in First Amendment cases and generally refers to government limitations on speech, including license and permit requirements, that are imposed without reference to the content of the regulations. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 US 640, 647-48, 101 S Ct 2559, 69 L Ed 2d 298 (1981) (describing concept and cases applying it). We use that phrase here to describe the OMIA's content-neutral regulation of highway signs, including—to the extent that they are content neutral— the permit and fee requirements. This case does not require us to define precisely the kinds of restrictions that may be permissible under Article I, section 8, or the extent to which those restrictions are similar to or different from permissible time, place, and manner restrictions under the First Amendment.

*Robertson* itself did not elaborate on the appropriate analysis of content-neutral government regulation of the time, place, and manner of speech, and, surprisingly, this court rarely has had occasion to consider the validity of such regulations.

In employing the *Robertson* framework, however, this court consistently has stated that there is room for "regulations imposed for reasons other than the substance of [a] particular message." *City of Portland v. Tidyman*, 306 Or 174, 182, 759 P2d 242 (1988). In *Tidyman*, for example, this court considered a city ordinance that prohibited "adult bookstores" in certain specified locations. The court held the ordinance unconstitutional because it was "flatly directed against one disfavored type of pictorial or verbal communication," 306 Or at 184, and because the city had failed to demonstrate that the specific type of communication in question caused invidious effects that would justify its restriction. *Id.* at 184-86. Yet the opinion in *Tidyman* took pains to point out that "regulation is not always unconstitutional [under Article I, section 8,] because it restricts one's choice of a place or time for self-expression * * *." *Id.* at 182. The court stated:

> "Even structures and activities unquestionably devoted to constitutionally privileged purposes such as * * * free expression are not immune from regulations imposed for reasons other than the substance of their particular message."

*Id.* Similarly, in *City of Hillsboro v. Purcell*, 306 Or 547, 761 P2d 510 (1988), this court struck down as overbroad a city ordinance that banned door-to-door solicitation but pointed out that the city could adopt regulations "that do not foreclose expression entirely but regulate when and how it can occur." *Id.* at 554. This court emphasized that Article I, section 8, did not prohibit "reasonable limitations on door-to-door solicitations" that "regulate[d], rather than totally proscribe[d]" the practice. *Id.* at 556.

Thus, while this court struck down the ban on door-to-door solicitation in *Purcell* because it arguably prohibited all door-to-door solicitation and the ban on adult bookstores in *Tidyman* because it was based on the content of the expression at issue, those cases also stand for the proposition that Article I, section 8, does not bar every content-neutral

regulation of the time, place, and manner of speech. *See also State v. Henry*, 302 Or 510, 525, 732 P2d 9 (1987) (holding that expression cannot be outlawed solely on ground that it is obscene, but "not rul[ing] out * * * reasonable time, place and manner regulations of the nuisance aspect of [obscene] material or laws to protect the unwilling viewer or children"); *accord City of Nyssa v. Dufloth/Smith*, 339 Or 330, 338-39, 121 P3d 639 (2005) (ordinance purporting only to restrict "manner" of expression by requiring nude dancers to remain at least four feet from their patrons was unconstitutional restriction on expression because it "applied only to one disfavored type of communication * * *"). In our view, the OMIA's regulation of highway signs, including its permit and fee requirements, except as discussed below, are reasonable time, place, and manner restrictions that are unrelated to the substance of any particular message.

The provisions quoted earlier show that the OMIA permit scheme, which on its face is neutral as to the content of speech, is not, in application, a means for the state to permit some speech and prohibit other speech based on content. Moreover, with the exception of the distinction between on-premises and off-premises signs, petitioner has not identified any instances in which the state has used its enforcement authority against petitioner or others to permit certain signs and prohibit others based on content. Put differently, because the permit scheme on its face (and, so far as this record demonstrates, also in practice) does not discriminate on the basis of the subject or content of speech, the OMIA does not effectuate government censorship of speech.

Notwithstanding the facial validity and content neutrality of the OMIA (other than the on-premises/off-premises distinction), petitioner argues that the fee requirement, as applied, is invalid because it "deters" speech. Of course, even a minimal fee or tax, at the margin, tends to reduce the level of the activity to which it applies. The real question, however, is whether the fee requirement suppresses speech in such a way that it "restrains" the free expression of opinion or "restricts" the right to speak freely on any subject, as protected by Article I, section 8. *Fidanque* held that the lobbyist registration fee at issue there was impermissible because

"the statute on its face does not tie the fee to the costs associated with registering lobbyists." 328 Or at 9. However, this court assumed "that a fee may be charged for the expenses that the government incurs as the result of a particular communicative activity, such as the expense of providing added police protection for a parade." *Id.* at 8. Here, as noted, ORS 377.729 expressly ties the fee to the cost of the regulatory program, and petitioner does not argue that the fee is unreasonable or exceeds the cost of the program.[10] On this record, we cannot conclude that the fee requirement is an impermissible restriction on speech.

Finally, petitioner argues that the OMIA's permit requirement, as applied, so burdens protected expression that it violates Article I, section 8. In that aspect of its case, petitioner relies on *Purcell* and *City of Eugene v. Miller*, 318 Or 480, 871 P2d 454 (1994), both of which involved ordinances that effectively *prohibited* certain forms of speech. In *Purcell*, the ordinance banned all door-to-door solicitation, while, in *Miller*, the ordinance permitted the sale of some products on city sidewalks but banned all sales of expressive material. In this case, it is apparent that, by limiting the number of outdoor advertising sign permits to the number of signs that existed in commercial and industrial zones in 1975, the OMIA was intended to, and does, cap the number of those signs that are visible from public highways. Petitioner appears to assert that the fact that it must obtain a permit lawfully to display its signs and that the number of permits is limited means that the OMIA necessarily violates Article I, section 8.

We disagree. Outdoor advertising signs, like other forms of expression, may have characteristics that make them uniquely suited to conveying certain messages to certain audiences. If the state were to prohibit billboards—or some other form of expression—entirely, then perhaps there would be reason to consider whether the effect of such a ban

---

[10] The current version of ORS 377.729, which ties the fee to the cost of the regulatory program, was not enacted until 2001. However, neither party suggests that the state has any intention of seeking to collect from petitioner any fee based on earlier versions of the statute, and we therefore do not consider the validity of the fee-setting provisions of earlier versions of ORS 377.729.

"restrain[ed] the free expression of opinion" or "restrict[ed] the right to speak, write, or print freely" under Article I, section 8. *Cf. Miller*, 318 Or at 487 (complete ban on sale and distribution of all expressive material, although content neutral, likely would violate Article I, section 8, "because it would restrict too greatly 'the free expression of opinion' and 'the right to speak, write, or print freely on any subject whatever' "). But the OMIA differs fundamentally from the complete ban on door-to-door solicitation in *Purcell* and the blanket exclusion of sellers of books and magazines from the sidewalk marketplace in *Miller*. The OMIA allows as many outdoor advertising signs (off-premises signs) as existed on June 12, 1975, as well as potentially thousands of on-premises signs. Petitioner has ample avenues to communicate its messages, both on highway signs and by other means. On this record, the permit and fee requirements do not unconstitutionally restrain the free expression of opinion or restrict the right to speak, write, or print freely on any subject whatsoever.

For the foregoing reasons, we conclude that the OMIA's provisions regarding the erection and maintenance of signs visible from public highways, including the permit and fee requirements—again with the exception of the statute's different treatment of on-premises and off-premises signs, as discussed below—are content-neutral time, place, and manner restrictions that do not violate Article I, section 8.

## IV.   ON-PREMISES AND OFF-PREMISES SIGNS

We now turn to petitioner's contention that the OMIA violates Article I, section 8, on its face by exempting on-premises signs from the permit and fee requirements. Petitioner argues that, under this court's decision in *Robertson*, the legislature may not enact restrictions that focus on the content or subject matter of expression unless the scope of the restraint is wholly confined within a "recognized historical constitutional exception." By requiring permits for off-premises signs, but not for on-premises signs, petitioner asserts, the OMIA restricts expression on the basis of "content" or "subject." Thus, petitioner argues that, under the OMIA, a sign above a gas station visible from a highway may, without a permit, carry the message "Gas for Sale," but it

may not carry the message "Eat at Joe's: 10 Miles Ahead." Petitioner also argues that no "historical exception" permits the state to restrict off-premises signs in circumstances where it does not restrict on-premises signs.

Before turning to the state's response, we note that the scope of the issue here is not as broad as petitioner suggests. Petitioner's brief uses, as additional examples of signs that it contends are prohibited by the OMIA, signs that in fact might not be prohibited by that law. Petitioner asserts that signs expressing the message "Pray for Peace" or the message "Keep Abortion Legal" always would require permits because they necessarily would be "outdoor advertising signs" rather than on-premises signs. Arguably, however, if the first message were displayed on the property of a church or the second message on the property of a facility offering abortion services, those signs would inform the public about "activities conducted on the premises on which the sign is located," ORS 377.710(22), and thus be considered on-premises signs not subject to the OMIA's permit requirement. Moreover, a plausible argument can be made that a sign with the message "Pray for Peace" on a residential lot *is* about activity on the premises, namely that the owner of the residence prays for peace and exhorts others to do the same. As we noted previously, 340 Or at 282-83 n 6, none of the present cases requires us to interpret the scope of the phrase "activities conducted [or not conducted] on the premises on which the sign is located" in the statutory definitions of "on-premises sign" and "outdoor advertising sign." *See* ORS 377.710(22), (23) (defining "on-premises sign" and "outdoor advertising sign"). However, the example in the previous paragraph (describing the signs "Gas for Sale" and "Eat at Joes: 10 Miles Ahead") is sufficient to demonstrate that, in many circumstances, the OMIA will permit one message on a highway sign while prohibiting a different message, and that difference squarely presents petitioner's constitutional claim.

The state responds that the on-premises/off-premises distinction is a content-neutral time, place, and manner regulation. The state first asserts that Article I, section 8, does not bar the state from imposing reasonable time, place, and manner restrictions on expression. It then argues

that the on-premises/off-premises distinction is not a restriction on the content or subject of expression, such as the restrictions that this court considered—and rejected—in *Robertson, Tidyman,* and similar cases.[11] The state's primary point is straightforward: "Any message can be an on-premises one, and any message can be an off-premises one." Therefore, in the state's view, the OMIA suppresses no message and no viewpoint.

The state contrasts this case with other cases in which an apparently neutral regulation had the *effect* of restricting certain categories of speech. In *Fidanque,* for example, a law that required registration fees for lobbyists was held to violate Article I, section 8, because it focused on only one category of speech "political speech." 328 Or at 8 n 4. Here, however, the state asserts that, unlike recognized categories of speech such as "political speech" or "commercial speech," the distinction between "on-premises" and "off-premises" speech has no meaning in terms of the *content* of the speech; the only distinction is the relationship between the message on the sign and its *location.* The state argues: "Simply put, a distinction between categories of speech cannot be truly 'content-based' if *any* speech could fit into either category depending on its location only." (Emphasis in original.)

We agree, as we have explained above, with the state's view that Article I, section 8, does not prohibit reasonable time, place, and manner regulation of speech imposed for reasons apart from the message of the speech. We also understand that the state is asserting that there is a constitutionally meaningful difference between the OMIA and laws that focus directly on categories of speech that are familiar from First Amendment cases, such as obscenity, political speech, and commercial speech. However, unlike the dissent, we do not find the state's argument persuasive. As noted, the

---

[11] This case was submitted before this court had issued its decision in *State v. Ciancanelli,* 339 Or 282, 121 P3d 613 (2005). In *Ciancanelli,* as here, the state urged us to reconsider and abandon the framework for analyzing Article I, section 8, that this court articulated in *Robertson* and subsequent cases. In *Ciancanelli,* this court reconsidered *Robertson* and its progeny and examined Article I, section 8, in detail before concluding that it would retain the *Robertson* framework. *Ciancanelli,* 339 Or at 314-15. There is no need to repeat that discussion here.

OMIA would allow a sign with the message "Buy Gas Here," but prohibit the same sign from carrying the message "Eat at Joe's: 10 Miles Ahead." As we explain at greater length below, such a restriction, on its face, prohibits certain speech based on its content. The OMIA's different treatment of on-premises and off-premises speech therefore violates Article I, section 8.

Although we recognize the differences between the OMIA and the statutes that we have considered in prior cases, our analysis is similar. As we have described above, for more than two decades, this court's consideration of challenges under Article I, section 8, to statutes that restrict speech has been guided by the framework laid out in *Robertson*, in which this court considered a statute criminalizing coercion. This court there held that Article I, section 8, "prohibits lawmakers from enacting restrictions that focus on the content of speech or writing, either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences." 293 Or at 416. This court followed *Robertson* in a series of cases holding unconstitutional legislative restrictions on certain categories of speech. In *Henry*, 302 Or 510, the court held that a statute prohibiting the possession of obscene materials violated the free expression guarantee of Article I, section 8, because it was directed, by its terms, at a category of expression. In *Tidyman*, the court struck down a city ordinance that restricted certain expressive activity—the sale of "adult" books—because of the content of the speech in question. This court also has held invalid a statute that prohibited the use of automatic telemarketing devices to solicit the purchase of realty, goods, or services, but not when used to solicit funds for charitable or political organizations. *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993). That statute "restrict[ed] expression because it [was] directed at a specific subject of communication, excluding some speech based on the content of the message," and therefore violated Article I, section 8. *Id.* at 376.

In each of those cases, this court applied the framework established in *Robertson* and considered whether the statute or ordinance restricted the "content" of speech because that speech was "deemed socially undesirable or

offensive, or because it [was] thought to have adverse consequences." *Robertson*, 293 Or at 416. The state argues that the on-premises/off-premises distinction does not focus on the *content* of speech that the government seeks to restrict because that speech is undesirable, offensive, or may have adverse consequences. Rather, in the state's view, the on-premises/off-premises distinction is a content- and viewpoint-neutral regulation that focuses instead on "secondary effects" in an effort to advance the state's interests as set out in the OMIA, including promoting highway safety and preserving the "natural beauty and aesthetic features of [state] highways and adjacent areas." *See* ORS 377.705 (statement of purpose of OMIA). The state also points out that the OMIA is designed to ensure compliance with federal highway statutes, particularly the HBA. *See, e.g.*, ORS 377.715 (prohibiting erection or maintenance of signs that fail to comply with federal requirements).

The state's argument suffers from two related flaws. First, it is not accurate to say that the on-premises/off-premises distinction is content neutral. That distinction allows a sign owner without a permit to display one narrowly defined category of message—a message related to activity conducted on the premises where the sign is located—but not to display any message respecting any other subject. The OMIA thus treats signs differently on the basis of the content of their message.[12] Second, the state's reliance on the legitimate safety and aesthetic goals of the OMIA does not justify a prohibition of speech based on its content. This court faced a similar issue in *Moser*, where the legislature sought to prevent the harmful effects of automatic telephone solicitation, but prohibited only commercial solicitation, while allowing charitable and political solicitation. This court rejected that

---

[12] This is the focal point of the dissent's disagreement with this opinion. The dissent states that the OMIA does not "favor one subject of speech over another one." 340 Or at 305 (Riggs, J., concurring in part and dissenting in part). With respect, the OMIA does exactly that: it unquestionably "favors" on-premises signs over off-premises signs. The dissent apparently believes that that distinction is not constitutionally relevant because, in the dissent's view, it is not based on the "socially undesirable or offensive" nature of off-premises signs. However, as we discuss in the text, Article I, section 8, prohibits restrictions on the "subject" of speech, and in the OMIA the legislature restricted some signs, but not others, based on the subject of their message.

effort because the restriction was "directed at speech itself, not towards the prevention of an identified actual effect or harm." *Moser*, 315 Or at 379. The state may prohibit signs and other structures that interfere with safe driving, and it may limit the total number of signs or structures for the purpose of preserving views and scenery. However, this court's opinions demonstrate that the state may not, consistently with Article I, section 8, prohibit some expression, while permitting other expression simply because the latter concerns a different subject. On-premises signs, which do not require a permit, and off-premises signs, which do require a permit, can pose the same risk to safety and have the same adverse effect on scenic beauty. The legislature's decision to limit one of those types of expression more stringently than the other because of its content is an impermissible restriction on the "subject" of expression under Article I, section 8.

As to the state's effort to comply with the HBA through enactment and enforcement of the OMIA, we are sympathetic to the state's arguments, recognizing the possibility that the failure to enforce restrictions such as those in the OMIA might result in a reduction in federal highway funds. *See* 23 USC § 131(b), (c) (HBA allows exemption for on-premises signs; state's failure to provide "effective control" of outdoor advertising signs may cause state to lose 10 percent of federal highway funds). Nevertheless, this court's Article I, section 8, cases consistently have held that the state may not enact restrictions that focus on the content of speech, and this restriction does just that.

We also find unpersuasive the state's arguments that are based on cases from other jurisdictions. Some courts and commentators have concluded that the distinction between on-premises and off-premises signs is not "content-based," *e.g.*, *Rappa v. New Castle County*, 18 F3d 1043, 1067 (3d Cir 1994), or, if "technically content-based," is not worthy of constitutional protection because "it is very unlikely that the government would use it to control speech or that it would distort public debate." Mark Cordes, *Sign Regulation After Ladue: Examining the Evolving Limits of First Amendment Protection*, 74 Neb L Rev 36, 77 & n 257 (1995); *see also*

Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 Wm & Mary L Rev 189 (1983) (analyzing policy reasons for prohibiting content-based restrictions). Whatever the merits of those conclusions as matters of appropriate policy towards expression or as interpretations of the First Amendment, however, they offer little guidance in interpreting the Oregon Constitution. The words of Article I, section 8, and this court's consistent interpretation of those words expressly forbid the enactment of laws that restrict otherwise permissible speech because of its "subject." *See Bank of Oregon v. Independent News*, 298 Or 434, 439, 693 P2d 35, *cert den*, 474 US 826 (1985) ("There is no basis under the Oregon Constitution to provide more protection to certain non-abusive communication based upon the content of the communication.").

In *Ciancanelli*, this court reassessed and reaffirmed its Article I, section 8, jurisprudence. Examining the text of that constitutional provision, this court stated:

> "Turning our focus to the first clause of Article I, section 8, one is struck by its sweeping terms, both with respect to the legislative power (*'[n]o'* law shall be passed restraining * * * or restricting) (emphasis added) and the kinds of expression protected (* * * the free expression of opinion, or * * * the right to speak, write, or print freely *on any subject whatever'*) (emphasis added). In fact, the words are so clear and sweeping that we think that we would not be keeping faith with the framers who wrote them if we were to qualify or water them down[.]"

339 Or at 311 (emphases and omissions in *Ciancanelli*).

The broad sweep of Article I, section 8, compels us to conclude that the provision was not intended only to prevent content-based restrictions that are motivated by an intent to censor offensive, disruptive, or potentially harmful speech. Although the dissent appears to accept that limited reading of Article I, section 8, in our view, Article I, section 8, prohibits laws that distinguish among messages because of what they say, even if some may view the basis for the distinction as benign. The OMIA does distinguish between messages on the basis of what they say: It permits a sign owner to display one message, but not to display a different message solely

because of the content of the message. For that reason, we conclude that the OMIA's different treatment of on-premises and off-premises signs is a restriction on the content of speech for purposes of Article I, section 8.[13]

The *Robertson* framework next asks whether the scope of the content-based restraint "is wholly confined within some historical exception," in which case it may be permitted notwithstanding Article I, section 8. *Robertson*, 293 Or at 412. In this context, that aspect of *Robertson* would require the state to demonstrate that restrictions on sign messages that distinguished between messages related to activities occurring on the property where the sign is located and messages related to activities elsewhere "were well established when 'the first American guarantees of freedoms of expression were adopted.'" *Moser*, 315 Or at 378 (quoting *Robertson*, 293 Or at 412). The state has offered no argument as to any such historical exception, and we are aware of none. *See Moser*, 315 Or at 378 (state failed to show that "restrictions on advertising or commercial solicitations" came within historical exception).

For the forgoing reasons, we conclude that the OMIA's on-premises/off-premises distinction—more particularly, the exemption from the OMIA's permit and fee requirements for on-premises signs, ORS 377.735(1)(c)—is, on its face, an impermissible restriction on the content of speech.

## V.  REMEDY

We now turn to the consequences of our holding for the remaining parts of the OMIA. Throughout this litigation, petitioner has argued that this court should invalidate the entire OMIA, and we now consider that issue in light of our resolution of petitioner's constitutional challenges.

---

[13] Because we conclude that the OMIA establishes a content-based restriction on expression, in our analysis the OMIA falls within the first class of laws described in *Robertson*. *See* 340 Or at 288-89 (discussing *Robertson* framework). The dissent, in contrast, claims that the OMIA simply restricts one "manner" of expression and therefore falls within the second class of laws described in *Robertson*. *See* 340 Or at 305-06 (Riggs, J., concurring in part and dissenting in part).

This court has held that when part of a statute is found to be unconstitutional, the whole statute need not be invalidated if the unconstitutional part is severable from the remainder of the statute. *See City University v. Oregon Office of Educ. Policy*, 320 Or 422, 425, 885 P2d 701 (1994) (so stating). Ordinarily, when one part of a statute is found unconstitutional, this court's practice (and the legislature's stated preference) is to sever the offending part and save the remainder of the statute, unless the legislature has directed otherwise, unless the parts of the statute are so interconnected that it appears likely that the remaining parts would not have been enacted without the unconstitutional part, or unless the remaining parts are incomplete and cannot be executed in accordance with legislative intent. *Id.* at 426 (discussing ORS 174.040).

In the context of statutes that violate Article I, section 8, this court held in *Robertson* that the remedy will depend on the particular constitutional defect. If part of the statute is unconstitutional on its face because it is "written in terms directed to the substance of any 'opinion' or any 'subject' of communication," then that part is simply invalid. *Robertson*, 293 Or at 412; *Miller*, 318 Or at 488. If, however, the statute is unconstitutional because it is "overbroad" and prohibits constitutionally privileged expression as well as expression that the legislation lawfully may punish or prohibit, then the court examines the statute to determine whether a "narrowing construction" of the statute is possible, *Robertson*, 293 Or at 412, or whether the "needed narrowing cannot be accomplished by judicial interpretation," *id.* at 436, and the legislature instead must undertake it, *id.* at 437. Finally, if the law violates Article I, section 8, because, even though focused on forbidden effects rather than expression, it nevertheless, as applied, restricts protected expression, then the statute itself ordinarily is not unconstitutional, but the person to whom it was applied successfully may defend against that application. *See Robertson*, 293 Or at 417 (discussing as-applied challenges to statutes that focus on forbidden effects but may implicate expression).

In this case, we have agreed only with petitioner's argument that the OMIA violates Article I, section 8, by imposing greater restrictions on some signs than others

based on the subject of the message on the sign. That difference in treatment comes within the first *Robertson* category of facially invalid restrictions on the content of expression, and the parts of the OMIA that effectuate that difference are invalid. We therefore consider whether those parts are severable from the rest of the OMIA. As described above, the OMIA includes many restrictions on highway signs that we do not find unconstitutional, including restrictions on sign size, spacing, location, and lighting. Those restrictions, in general, apply equally to on-premises and off-premises signs, and we think that the legislature would have wanted them to remain in effect, notwithstanding the unconstitutionality of the on-premises/off-premises distinction. Accordingly, we hold that the OMIA is not unconstitutional in its entirety.

Our conclusion that the OMIA's different treatment of on-premises and off-premises signs is unconstitutional presents a more difficult problem. We can end that infirmity either by striking from the OMIA the exemption from the permit requirement for on-premises signs, ORS 377.735(1)(c), or by striking the permit requirement itself, ORS 377.725(1), as it applies to outdoor advertising signs (off-premises signs).[14] In choosing between those alternatives, we are mindful of the legislature's policy statement in ORS 377.705 that the purposes of the OMIA include "promot[ing] public safety," "preserv[ing] the natural beauty and aesthetic features" of state highways, and "prohibit[ing] the indiscriminate use of * * * outdoor advertising." However, we also are aware from the record that the number of existing on-premises signs, which do not require OMIA permits or fees, far exceeds the number of outdoor advertising signs, which do require permits and fees. We thus find ourselves faced with the same two unpalatable choices that the legislature would face: permitting sign owners to display "off-premises" (outdoor advertising) signs without obtaining the permits required by the OMIA, or imposing new permit and

---

[14] The OMIA requires permits for signs other than outdoor advertising signs and contains exceptions to the permit requirement for signs other than on-premises signs. The validity of the permit scheme, as applied to other kinds of signs, such as "directional signs" and "motorist informational signs," is not at issue in this case and may involve different considerations than those that we have discussed in this opinion. Accordingly, we express no view as to the constitutionality of the OMIA's permit requirements as applied to those other kinds of signs.

fee requirements on thousands of individuals and businesses that now have on-premises signs. We think that, faced with that choice, the legislature would not have been willing to extend the OMIA's permit and fee requirements to the large category of new and existing on-premises signs. Accordingly, we conclude that the appropriate remedy in light of our holding is to strike from the OMIA the permit and fee requirements for outdoor advertising signs, ORS 377.725(1).

As we have accepted one of petitioner's legal arguments and rejected others, we reverse the agency orders requiring the removal of petitioner's signs and remand the cases to the respective agencies for further proceedings.

The decisions of the Court of Appeals and the orders of the Driver and Motor Vehicle Services Branch and the Department of Transportation are reversed. Case numbers S50003, S50007, and S50044 are remanded to the Driver and Motor Vehicle Services Branch for further proceedings, and case numbers S49978 and S50458 are remanded to the Department of Transportation for further proceedings.

**RIGGS, J.,** concurring in part and dissenting in part.

I concur with the majority in every respect except that part of its opinion holding that the OMIA's exemption from the permit and fee requirements for on-premises signs violates Article I, section 8, of the Oregon Constitution. The majority incorrectly concludes that the OMIA impermissibly regulates the content of speech. I conclude that the OMIA is constitutional under Article I, section 8.

This court's framework for analyzing claims under Article I, section 8, was set out in *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982). This court has summarized that framework as follows:

"In *State v. Robertson*, * * * this court established a framework for evaluating whether a law violates Article I, section 8. First, the court recognized a distinction between laws that focus on the *content* of speech or writing and laws that focus on the pursuit or accomplishment of *forbidden results*. The court reasoned that a law of the former type, a

law 'written in terms directed to the substance of any "opinion" or any "subject" of communication,' violates Article I, section 8,

> " 'unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.'

"Laws of the latter type, which focus on forbidden results, can be divided further into two categories. The first category focuses on forbidden effects, but expressly prohibits expression used to achieve those effects. The coercion law at issue in *Robertson* was of that category. Such laws are analyzed for overbreadth:

> " 'When the proscribed means include speech or writing, however, even a law written to focus on a forbidden effect * * * must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth." '

"The second kind of law also focuses on forbidden effects, but without referring to expression at all. Of that category, this court wrote:

> " 'If [a] statute [is] directed only against causing the forbidden effects, a person accused of causing such effects by language or gestures would be left to assert (apart from a vagueness claim) that the statute could not constitutionally be applied to his particular words or other expression, not that it was drawn and enacted contrary to article I, section 8.' "

*State v. Plowman*, 314 Or 157, 163-64, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993) (quoting *Robertson*; internal citations and footnote omitted; alterations and emphasis in *Plowman*).

The majority correctly begins its analysis of the OMIA by considering whether the OMIA "focus[es] on the content of speech or writing" or whether it "focus[es] on proscribing the pursuit or accomplishment of forbidden results." *See Plowman*, 314 Or at 164 (emphasis deleted; setting out analysis). The majority errs, however, when it concludes that

the OMIA unconstitutionally focuses on the content of speech or writing, the first class of laws identified in *Robertson*.

By laws that focus on the content of speech, this court in *Robertson* meant laws that restrict or prohibit a *particular message or subject of communication*, such as obscenity, "either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences." *Robertson*, 293 Or at 416; *see also State v. Ciancanelli*, 339 Or 282, 318, 121 P3d 613 (2005) (such laws purport to protect against "any supposed harm that *the message itself* might be presumed to cause to the hearer or to society" (emphasis added)); *City of Hillsboro v. Purcell*, 306 Or 547, 554 n 4, 761 P2d 510 (1988) (distinguishing between "the offensive *form* of some communication," which may be regulated, and "the offensive *character of an idea*," which cannot be regulated (emphasis added; internal quotation marks and citation omitted)); *City of Portland v. Tidyman*, 306 Or 174, 182, 759 P2d 242 (1988) (speech "not immune from regulations imposed for reasons other than the *substance of their particular message*" (emphasis added)).

This court's cases reflect the understanding that laws focus on the content of speech when they attack a particular, identifiable *subject* of communication. The cases relied on by the majority, plus others, struck down limits on just such particular subjects of communication. In *State v. Henry*, 302 Or 510, 732 P2d 9 (1987), for example, the challenged statute criminalized the distribution of obscene material. In *Tidyman*, the zoning ordinance at issue restricted the location of "adult bookstores"; this court noted that the ordinance was "flatly directed against one disfavored type of pictorial or verbal communication." 306 Or at 184. In *Moser v. Frohnmayer*, 315 Or 372, 845 P2d 1284 (1993), the challenged statute prohibited telemarketers from using automatic message machines to sell realty, goods, or services; the court noted that the statute "restricts expression because it is directed at a specific subject of communication[.]" *Id.* at 376. And, in *Fidanque v. Oregon Govt. Standards and Practices*, 328 Or 1, 969 P2d 376 (1998), the statute at issue required lobbyists to pay a licensing fee; the court noted that the statute "turns out not to be content-neutral at all. Its focus is political speech." *Id.* at 8 n 4. Even this court's most recent

decisions involved the same sort of restrictions. *See, e.g., City of Nyssa v. Dufloth / Smith*, 339 Or 330, 339, 121 P3d 639 (2005) ("the ordinance applies only to one disfavored type of communication (nude performances) in one disfavored type of establishment (one that regularly features that type of entertainment)").[1]

But the OMIA does not prohibit any particular subject of speech for being "socially undesirable or offensive" or for "hav[ing] adverse consequences." Nor does it favor one subject of speech over another one.[2] Indeed, the OMIA is not about the *subject* of the message at all. The majority nicely summarizes the state's argument:

> "[T]he distinction between 'on-premises' and 'off-premises' speech has no meaning in terms of the *content* of the speech; the only distinction is the relationship between the message on the sign and its *location*."

340 Or at 294 (emphasis in original). "Any message can be an on-premises one, and any message can be an off-premises one," as the state argues. It all depends on what the property owner does where the sign is located—and the property owner controls that, not the government.

The OMIA does not prohibit any identifiable message. It does not restrict speech as speech. It is not in the first class of laws described by *Robertson*, and the majority errs in concluding otherwise.

Instead, the OMIA falls within the second class of laws described by *Robertson*: It "focuses on forbidden effects, but expressly prohibits expression used to achieve those

---

[1] The majority itself essentially relies on the same distinction elsewhere in its opinion. The majority rejects petitioner's "prior restraint" argument because "the purpose of the prohibition on prior restraints" is "to bar the state from deciding in advance what expression it will permit." 340 Or at 286. The majority also concludes that the permit scheme is constitutional because it "does not effectuate government censorship of speech." 340 Or at 290.

The same purpose underlies the distinction between laws that focus on speech as speech and laws that focus on preventing harmful results. Yet, the majority refuses to recognize it here.

[2] In particular, let me reaffirm one other statement by the majority. The statute does not, contrary to petitioner's arguments, favor commercial speech over political speech. "Pray for Peace," for example, would qualify as an on-premises sign for a church. 340 Or at 293.

effects." *Plowman*, 314 Or at 164. The OMIA merely restricts one manner in which messages may be communicated—by billboard. It seeks to prevent the effects of speech carried on in that way—distracting drivers, blocking views of traffic hazards, blocking scenic views, etc. *See, e.g.*, ORS 377.705 (OMIA intended, among other things, to "promote the public safety; to preserve the recreational value of public travel on the state's highways; to preserve the natural beauty and aesthetic features of such highways and adjacent areas"); ORS 377.720(2) (prohibiting signs that block view of traffic signs or approaching traffic). Although the OMIA focuses on harmful effects, it expressly prohibits expression that is used to achieve those effects.

Because the OMIA falls within the second class of laws described in *Robertson*, we should consider whether the OMIA is overbroad. *See, e.g., Plowman*, 314 Or at 164 (so noting). A statute is overbroad when it prohibits a party from engaging in constitutionally protected conduct (here, free expression under Article I, section 8) in at least some situations:

> "Unlike with other facial challenges, a challenger raising an overbreadth challenge need not demonstrate that the statute at issue is unconstitutional under the particular circumstances at hand. Rather, the challenger will prevail in his or her facial challenge if the court concludes that the statute in question prohibits constitutionally protected conduct of any kind."

*State v. Hirsch/Friend*, 338 Or 622, 628, 114 P3d 1104 (2005) (citation omitted).

The majority's analysis here shows why the OMIA is not unconstitutionally overbroad. Only the limits on "outdoor advertising sign[s]" bar any manner of speech, so only those limits could render the OMIA unconstitutionally overbroad. (The exception for on-premises signs is beside the point, because that exception does not *prohibit* any constitutionally protected messages. It does not prohibit any messages at all—it allows them, and without discriminating in favor of any particular subject of communication.) As the majority explains, the "outdoor advertising sign" limits are constitutional as a reasonable manner restriction, and I agree.

Because the off-premises advertising sign restrictions are constitutional, the OMIA is not unconstitutionally overbroad.

The OMIA is concerned with "the medium, not the message, as when park regulations ban fireworks even for a Fourth of July celebration." *Tidyman*, 306 Or at 182-83. It is constitutional under Article I, section 8. Although I concur with much of the majority's reasoning, I respectfully dissent on that point.